IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE MEMPHIS DIVISION

REGINALD ALAN DAVIS

PLAINTIFF,

VS.                                                Docket: _____

                                                                JURY DEMAND

CITY OF MEMPHIS FIRE DEPARTMENT,
and Mayor A.C. Wharton; And Alvin Benson,
individually and in his official capacity as Director
of Fire Department; Daryle Payton, individually and
in his official capacity; Sandra E. Richards individually
and in her official capacity,

DEFENDANTS.

## COMPLAINT

Comes the Plaintiff, Reginald Alan Davis, by and through counsel of record, and in support hereof would respectfully show unto the Court as follows:

### I. PARTIES AND JURISDICTION

1. Plaintiff, Reginald Alan Davis (hereinafter Lt. Davis), a Black male who is a resident of the State of Tennessee, who have worked for the City of Memphis as a firefighter twenty-two years.

2. The individual Defendants are all residents and citizens of the State of Tennessee, who, at all times, acted under color of state law, by virtue of their employment with the Defendant City of Memphis, a Tennessee municipality. Defendants are sued collectively as Defendants herein after.

3. This is an action brought to address deprivation of certain constitutional rights granted to Plaintiff, Lt. Davis, under the Fifth and Fourteenth Amendments of the United States Constitution, as allowed under 42 U.S.C. §1983. Plaintiff brings this action for discrimination of employment based upon race in violation of Seniority Bidding Policy of the Memphis Fire Department in which Lt. Davis was removed from his seniority bidding station E-6-B and by a Caucasian male with substantially less seniority.

4. All of the Defendants committed the unconstitutional acts herein after complained

5. All of the Defendants are sued in their official and individual capacities.

6. The Plaintiff would invoke the Court's pendant jurisdiction to hear his state claims Pursuant to 28 U.S.C. 1367(a) as those claims arise from the same facts and circumstances as his federal claims.

7. Accordingly, this Court has federal question subject matter jurisdiction under 28 U.S.C. §1331 and venue is proper under 28 U.S.C. § 1391. This Court has personal jurisdiction over the parties.

8. A charge of discrimination was filed with the Equal Employment Opportunity Commission ("EEOC"), the charge no.490-2011-02064 was initiated with the EEOC on June 30, 2011, and filing was completed with EEOC on September 13, 2011. The charge is attached hereto as Exhibit "A" and incorporated by reference herein.

9. A Right to Sue notice for the charge has been issued; and a true and correct copy is attached hereto as Exhibit "B". This action is timely filed.

## II.   NOTICE

10. This is an action under the Tennessee Governmental Tort Liability Act (TGLA) TCA §29-20-101, et.seq. Under said act, the Defendant City of Memphis is liable for the negligent

acts or omissions of employees under the GTLA and the doctrine of respondent superior and other agency relationships.

11. This is also an action against the Defendant City of Memphis and Mayor AC Wharton; and against the Defendant Director Alvin Benson; and the Defendant Chief Darryl Payton, individually and in their official capacities, for committing acts under the color of law and depriving Plaintiff of rights secured by the Constitution and laws of the United States and the State of Tennessee as well as for other claims as set forth below.

### III. GENERAL ALLEGATIONS OF FACTS

12. Lt. Davis began his employment as a firefighter with the City of Memphis on April 28, 1989 at the age of 25 years old after servicing his country in the United States Marine Corp., where he received an honorable discharge. In September 11, 2001, after fulfilling all the requirements he was promoted to the rank of Lieutenant. And, in February of 2003, in accordance to the biding procedure of the fire department Lt. Davis bided for station E-6-B and received the bid. Lt. Davis remained at station E-6-B until April of 2011 when he was replaced by a white male with substantially less seniority in violation of the Fire Department's rules per the Memorandum of Understanding, Article 18 (Seniority Bid Transfers) section 4.

13. At all times relevant, Lt. Davis was and is an exemplary employee performing his duties in a competent and professional manner at all times during his employments with the City of Memphis fire department. Never receiving a disciplinary action of any type prior to the commencement of harassment toward him and he has been praised for his work and received a community service award in 2007.

14. Lt. Davis has always gone above and beyond his duties and responsibilities when it came to assisting other firemen in their quest for promotion. His command staff recognized his ability

and interest in helping others rise in rank and would assign firemen to his command that were considered not trainable or having trouble getting qualified on certain pieces of equipment.

15. Due to issues concerning hiring practices and promotion of black firefighters Lt. Davis and a group of other fire fighters got together and started a local chapter of the International Association of Black Professional Fire Fighters ("IABPF") called the Progressive Black Firefighters Organization. The IABPF consisted of black chiefs within the fire department such as Director Alvin Benson, Chief Darryl Payton and Battalion Chief Sandra E. Richards as well as other black chiefs through out the fire department. The goal of the progressive black fire fighters organization was to advance the recruitment, hiring and promotion of black fire fighters.

16. The members of the Progressive Black Fire Fighters Organization were required to pay a monthly due of twenty dollars and it was automatically deducted from their checking accounts.

17. After a series of event Battalion Chief Sandra E. Richards was elected president of the Progressive Black Fire Fighters Organization. There came a time when the members were considering merging with the Black Pinkeers Organization and asked Lt. Davis to mediate the union.

18. While engaged in the meditation talks Lt. Davis learned that Battalion Chief Sandra E. Richards was planning on stepping down as president of the progressive Black Fire Fighters Organization and that the treasure of the organization, would be replacing her as the new president. Lt. Davis suggested that an audit of the books before the new president took over to show the Black Pioneers Organization that the Progressive Black Fire fighters Organization was financially strong. It was then that Lt. Davis learned that Battalion Chief Sandra E. Richards had total control and custody of the financial books.

19. Lt. Davis and other members of the Progressive Black Fire Fighters Organization received an anonymous letter stating Battalion Chief Sandra E. Richards had misappropriated funds that belonged to the Progressive black fire Fighters. In response, Lt. Davis and members of the Progressive black fire fighters organization requested to see the financial records from Battalion Chief Sandra E. Richards and their request was denied. When they pressed the issue, Battalion Chief Sandra E. Richards in a T.V. interview accursed Lt. Davis and another member of trying to black mail her.

20. On September 21, 2010, Battalion Chief Sandra E. Richards and Lt. Craig Eddins acting under orders from Division Chief Gina Sweat, a white female, to inspect for unavailable lockers and they took that as an opportunity to unlawfully and without cause searched Lt. Davis' personal locker. This was also a violation of Vol. 1 of the Operations Manual Section 5-9, first paragraph, which have required Lt. Davis being afforded the opportunity to be present if a search of his personal locker was necessary. Lt. Davis filed a complaint with Chief Minquell Hubbard and Chief Henry Posey against them, but nothing was done and his complaint went unaddressed.

21. When Lt. Davis' personal locker was searched Battalion Chief Sandra E. Richards took pictures of Lt. Davis' personal information such as his recent garnishment, check stub with his social security number and a copy of his bankruptcy was posted on a local website. Lt. Davis sent an e-mail to Chief Minquell Hubbard requesting a meeting with the chain of command so he could file a complaint against Battalion Chief Sandra E. Richards and Lt. Craig Eddins. Chief Minquell Hubbard refused to do anything about the breach of privacy of Lt. Davis' locker. And, his request to meet with the chain of command was ignored.

22. On December 23, 2010, Lt Davis arrived at work and was immediately accosted by Lt. Craig Eddins. He cursed Lt. Davis, got in his personal space and threatened him. Lt. Craig

Eddins screamed at Lt. Davis and said, he was dry snitching on his shift, referring to Lt. Davis' off duty investigation of Battalion Chief Sandra E. Richard and the missing money from the Progressive Black Fire Fighters Fund. Lt. Craig Eddins also stated to Lt. Davis that he was not going to let him do his Chief (referring to Battalion Chief Sandra E. Richards) like that. Again, Lt. Davis reported this incident to Chief Hubbard and filed a complaint. And again, Chief Hubbard acted as a shield to protect Lt. Craig Eddins ( Lt. Craig Eddins was at one time Chief Hubbard's driver) and nothing was done.

23. On February 7, 2011, Lt. Davis fire station responded to an automatic alarm. Upon arriving to the scene and investigating nothing was found and Lt. Davis conveyed that to the security guard for the property. The security guard walked Lt. Davis to the gate as they engaged in pleasant conversation. The next day Lt. Davis was contacted by Chief Hubbard alleging that the security guard had called in and filed a complaint against him accusing him of cursing him out, etc. Lt. Davis immediately responded with his written account of the incident and denied the allegations. Lt. Davis's fire crew backed up his account of the incident and submitted their red lines in support of Lt. Davis. Nonetheless, a hearing was held and Lt. Davis was not allowed to face his alleged accuser and as far as he knew the only time the alleged security guard spoke with anyone concerning the matter was the alleged phone called making the alleged allegations. After, the hearing, Lt. Davis was given an oral reprimand (the first negative mark on Lt. Davis' record in his 22 year tenure). In accordance with the Personnel Manuel 38-03, Lt. Davis had a right to appeal the oral reprimand. However, Lt. Davis e-mailed Chief Booker and officially attempted to exercise his right to appeal the oral reprimand, his appeal request was ignored.

24. Shortly after the alleged complaint from the security guard, Lt. Davis received an unexplained and sudden notice that he was being temporary assigned to station E-42-B. Lt.

Davis stayed at his temporary assignment at station E-42-B from February 15 to April 15, 2011. However, once the assignment was over Lt. Davis was not returned to his station E-6-B per fire department policy he was given another temporary assignment.

25. Lt. Davis was given another temporary assignment at Fire Station E-33-A, a shift located on the Memphis Airport property. This assignment was even more so disturbing to Lt. Davis because it changed his days off. Hence, Lt. Davis contacted Chief Henry Posey and explained to him that changing his shift was interfering with the custody of his daughter and would cause a hardship because he would not be able to adjust his off days to accommodate his parental obligations. His concern was ignored and he did not receive a response.

26. Now that Lt. Davis was on a different shift he was unable to pick his daughter up from school or take her to her after school sport activities which he really looked forward to spending the time with her caused him great distress that he was losing so much time with his daughter. .

27.    Lt. Davis contacted and pointed out to Chief Henry Posey that He was a 22 year veteran lieutenant with no infractions on his record that warranted the unexplained and sudden moves and that he had not been advised by anyone in management of any violations of rules per the Memorandum of Understanding, Article 18 (Seniority Bid Transfers) Section 4 that would warrant him not being returned back to his biding station E-6-B so that he could keep his work schedule and fulfill his parental obligations with his daughter. He requested a meeting with the chain of command because he wanted an explanation for why he was moved from his biding station and was being moved around on temporary assignments. His request was ignored.

28. Unbeknownst to Lt. Davis, while he was being bounced around from station to station on temporary assignments, A Caucasian male with substantially less seniority had been permanently assigned to his biding station E-6-B.

29. All of Davis' concerns about his second transfer to another temporary assignment was ignored and he was sent to fire station 33-A. Being studious and professional he began reading and studying the procedure manuals regarding fire fighting requirements for aircrafts. It was then he discovered that neither he nor the other seven (7) crew members he was in command over were unqualified nor certified to fight aircraft fire. He immediately voiced his concerns to his command staff. Lt. Davis informed them he feared for the public safety and the safety of his crew due to the fact that they were ill-prepared and not trained to respond to aircraft fires. He specifically was concerned that Pres. Obama was flying into the Memphis Airport the next day and he feared the consequences should his station be called to respond to an incident. His concerns fell on deft ears and he received no response from command staff.

30. Lt. Davis continued to inquire and voice his concerns about unqualified and ill-prepared firefighters stationed at the airport and continued to point the out the possible dangers to his crew and himself. Yet his concerns continued to be ignored and yet again he was transferred. Lt. Davis' reported to his newly assigned station E-45-D. His first day at the station, Deputy Director Newsom came to talk with him about his concerns of being unqualified at the airport and in violation of FAA regulations which presented a serious threat to public safety. At which time Lt. Davis also pointed out that he and other unqualified firefighters were receiving hazardous duty pay but had not been certified in any hazardous duty training operations. Deputy Chief Newsom listened but has neither admitted nor denied, to this day, his concerns as being valid but appeared to be concerned that Lt. Davis would take his concerns public.

31. Sunday, June 5, 2011 was only the second Lt. Davis' reassignment to station FE-45-B. His day started like most of his days normally did with him cooking breakfast for his crew and then reading his bible. Shortly after Lt. Davis routine day started, Deputy Chief Darryl Payton showed up. He was off duty and in his civilian clothes. He approached Lt. Davis and asked to speak with him. Lt. Davis having the foresight requested that the meeting be on an official level and that he be allowed to have a witness. He asked Michael Echols a fire fighter that was stationed there with him to attend the meeting. During the meeting Lt. Davis once again voiced his concerns about the Memphis Fire Department being in violation of FAA regulations that were being violated at the airport station 33-A. Lt. Davis asked Deputy Chief Daryl Peyton why he was moved from his original bidding station (6B) and why was he being bounced around on temporary assignments. He also asked Deputy Chief Davis why had Chief Booker was allow to create a hostile work environment by leaving him off of any Battalion's Table of Organization; denying him 4 hours callback for following Chief Hubbard's written order; to buffaloing him to E-7B for 2 days as though he did not have an assignment; to ignoring the agreement between management and the union pertaining to Article 18, section 4

(returning personnel back to their last bid position after their temporary assignment is completed); to ignoring all but one of many request concerning his mistreatment by management; to placing the public and personnel in harm's way by assigning uncertified and unqualified personnel to E-33-A that respond on airport property. Deputy Chief Payton only responded to one of the questions Lt. Davis asked. In response to why Lt. Davis was moved from his permanent station at E-6-B, Chief Payton said it was because of Lt. Davis's off duty investigation of Battalion Chief Sandra E. Richard and that Chief Sweat requested that he be moved but that he approved the move. When Lt. Davis began to write Chief Payton statements

down in his daily diary, Chief Payton became unglued. He started to cussing and screaming saying I don't give a f...K writing in your f...king diary. You can tell the F...K City Council; tell the F...King Mayor, I don't give a f...k. At that point Lt. Davis said this meeting is over because you are not going to cuss me like that. Lt. Davis left the room and Chief Payton followed him to the next room, blocked his exit and began pleading with Lt. Davis not to leave at which point he dropped to the floor and wrapped his arms around Lt. Davis's legs causing him to fall and sprain his right wrist and injury his left hand. Lt. Davis finally was able to leave the room and attempted to call off sick but Chief Payton kept snatching the phone from him and hanging it up. At which point, Lt. Davis gave up trying to call into the command center and proceeded into the parking lot where his vehicle was located. Once again, Chief Payton pursued him into the parking lot, pleading with him not to leave, all the while banging on the passenger door of Lt. Davis' car.

32. Once Lt. Davis finally was able to drive away he immediately tried to call the Police from his cell, but he was placed on hold for too long and drove straight to the station located on Union Avenue. Once there he informed the Police what had occurred and filed assault charges against chief Payton.

33. Lt. Davis was met at the Police Station by another firefighter and upon completing his charges against Chief Daryl Payton, his friend drove him immediately to the doctor. Once at the doctor Lt. Davis was diagnosed with a sprained wrist and a swollen hand. His left hand was placed in a brace and he was given pain medication.

34. While at the doctor's office, Lt. Davis called back to the station to inquire about some items he had left, It was then he was informed that Chief Payton has issued a city wide memo banning Lt. Davis from all the fire stations

35. Now that Lt. Davis had learned that he was not allowed on any Memphis Fire Department stations, he called a fellow firefighter to bring him a sick leave form so that he could officially file for sick leave and he returned home and waited to hear from his command center.

36. It took three days for the command staff to contact Lt. Davis and get his version of the attack. However, Lt. Davis had already submitted a redline outlining the details of the assault and filed a police report against Daryl Payton.

37. June 8, 2011, Lt. Davis reported to command headquarters, per Det. Benson's request for a hearing. He asked a fellow firefighter and friend to accompany him to the hearing and be his witness. The hearing took approximately 1.5 hours and resulted with Lt. Davis being relieved of duty with pay, pending the outcome of the investigation. No action was taken against Chief Payton. It took

38. It took a month and a half for Director Benson to complete the investigation and render his finding, basically director Benson found Lt. Davis statement not be credible and ordered a fitness for duty evaluation on Lt. Davis. Initially, Director Benson would not respond to Lt. Davis' request for an explanation or a business necessity for ordering him to undergo a fitness for duty evaluation. There had not been any indication that Lt. David was a threat to himself or others or that he lacked the ability to continue performing his duties as a Lt. Firefighter. Nor did he have any grounds for suspecting Lt. Davis was a threat to himself or to others as a basis for ordering Lt. Davis to undergo a fitness for duty evaluation.

39. Lt. Davis objected to the fitness for duty evaluation on the grounds that it was a pretext to cover the assault by Chief Payton and to justify moving him from his bidding station and bouncing him around in temporary assignments.

Once Lt. Davis got his attorney involved, Director Benson provided him with a list of allegations that was his reasoning for ordering his physical fitness evaluation. Everything on the list was all the harassment and retaliation that Lt. Davis had endured since the start of his investigation with Sandra Richards and his concerns about having unqualified firefighters stationed at the Memphis Airport. Lt. Davis requested that he be allowed to have the fitness evaluation performed by a doctor of his choice but was threatened with termination if he did not submit to the evaluation performed by a doctor chosen by the Memphis Firefighters. Lt. Davis objected to the necessity of an evaluation but he knew his job was on the line so he requested to have the evaluation performed by a psychologist of his choosing. Chief Jubert's response was that he had to be evaluated by a MFD choice physician and if he did not he would be termination. To the physical evaluation was assigned to the training station. Lt. Davis did eventually accept a doctor chosen by the MFD. The evaluation took 4 hours. At the end of the evaluation he was informed that it probably take a week to get the results. However, the next day, Lt. Davis received notification that he had passed his evaluation with high scores and that he was in fact fit for duty. Lt. Davis had been assigned to the training station while awaiting the results of the fitness for duty evaluation. Once the results of Lt. Davis' evaluation was submitted showing he was fit for duty he was transferred from the training station (4) and given another temporary assignment to station 32. After two weeks temporary assignment at 32, Lt. Davis was temporarily assigned to station 40. Lt. Eddins is also assigned to station 40, but on a different shift. However, during the shift change, it is practice and policy for the Lieutenants to pass down information of the previous shift to the incoming Lieutenant. Lt. Eddins continued his hostile and disparaging remarks to Lt. Davis and even went so far as to tell the crew that he could not stand Lt. Davis and did not want to work around him each time Lt, Davis attempted the pass down of

information to him. Once again, Lt. Davis took it upon himself to resolve the matter professionally and quietly by filing a complaint with the chief requesting that Lt. Eddins be reprimanded and prohibited from verbally assaulting him and creating a hostile work environment. As usual, the chief took the position of a shield and tried to talk Lt. Davis out of filing a formal complaint against Lt. Eddins.

40. Lt. Eddins continued to talk negatively about Lt. Davis to other firefighters, constantly undermining his authority and attacking his reputation. Defendant's overt harassment of Lt. Davis is pervasive of long duration and continues even as of today with no intervention on behalf of the command staff. His constant diapering remarks and negative comments has interfered with his abilities to perform his job duties. He has been bounced around and assigned to seven different stations in seven months without cause or explanation. The Plaintiff, Lt. Davis has been denied his right to equal protection of laws and due process of laws. /the Defendants has a pattern of practice of discrimination against individuals based on race as well as denying its employees certain constitutional rights as alleged herein.

41. Lt. Davis has been discriminated because he is a male when the command staff took Chief Sandra Richards word that he had treated her and she feared for her life; but did not afford him the right to a hearing before effectually demoting him.

42. Lt. Davis has been damaged by Defendants' action; he has incurred loss of pay, damage to his reputation, and physical and emotional pain and suffering, past, present and future. He has incurred medical expenses, which are reasonably predicted to continue into the future.

43. The actions of the Defendants are part of a pattern and conspiracy of such actions, establishing a reckless disregard and indifference to due process for which punitive damages should be awarded.

44. On or about June 1, 2011, Lt. Davis sent an e-mail to his command staff concerning his lack of qualification and certifications to be assigned to the station 33A on airport property. He further pointed out that only one of his firefighters had the proper qualifications and certifications in compliance with the FAA regulations. As a result he was reassigned for the fourth time in three months without cause or explanation. He was harassed, threatened with termination and assaulted in retaliation for complaining about the violations of the FAA regulations and the obvious threat to public safety.

## COUNT ONE

1. Plaintiff re-alleges the foregoing as if fully set out herein.
2. As alleged above, all Defendants are sue in their individual and official capacities.
3. All actions were taken under color of state law.
4. By virtue of the facts alleged above, Defendants have discriminated against Plaintiff on the basis of his rave in violation of 42 U.S.C. § 1981.
5. As a direct and proximate cause of Defendant's acts and omissions alleged herein, Plaintiff has suffered severe mental and emotional distress, lost wages, and incurred other special damages in an amount to be proven at trial.
6. Defendant's actions have been so egregious that Plaintiff should be awarded punitive damages against the Defendants in their individual capacities.

## COUNT TWO

1. Plaintiff had a constitutionally protected liberty interest and property interest in his employment with the City of Memphis,

2. Furthermore, Plaintiff had a clearly established right to be free from racial discrimination, to receive equal protection, and to receive due process under the law.

3. Nonetheless, Defendants have deprived him of his right to be free from racial discrimination, of his right to equal protection of laws, and of this right to both substantive and procedural due process,

4. Indeed, Defendants have maintained an informal forum of policy or custom that has directly caused the deprivations alleged above, Furthermore, Defendants are policy makers.

5. In their role as policy makers, Defendants have failed to train City of Memphis employees' and this failure has lead to deprivation of Plaintiff's constitutional rights alleged herein,

6. Alternatively, Plaintiff alleges that the Defendants have ratified the actions taken herein.

7. As a direct and proximate cause of Defendant's acts and omissions alleged herein, Plaintiff has suffered severe mental and emotional distress, lost wages, and incurred other damages in an amount to be proven at trial.

## COUNT THREE

## TENNESSEE PUBLIC PROTECTION ACT

The allegations contained in paragraphs ___ through ___ are reaffirmed and incorporated as if fully set forth herein.

1. The defendant, City of Memphis, Tennessee is a governmental entity within the meaning of the Governmental Tort Liability Act (GTLA), Tenn. Code Ann. 29-21-101, et. seq. and is liable for the negligent acts and omissions of employees under GTLA and the doctrine of respondent superior and other agency relationships.

2. At all times pertinent to this action, the Defendants and other employees of the City of Memphis were acting within the course and scope of their employment.

3. That, without limiting the general allegations of negligence, the Defendants City Attorney Herman Morris and Defendant Senior Legal Administrator Cathy Porter were negligent as follows:

- Failing to follow established policies and procedures relating to employee leave and pay, whistleblower protections, and open records requests;
- Failing to properly train and supervise employees with regard to employee leave and pay policies;
- Failing to adopt policies and procedures relating to absences by employees;

4. That, without limiting the general allegations of negligence, the Defendant City of Memphis was negligent as follows:

- Failing to properly train and supervise employees with regard to employee leave and pay policies;
- Failing to establish appropriate policies and procedures regarding relating to absences by employees;
- Failure to require fair and across-the board enforcement of city leave and pay policies

5. That it was foreseeable that a person such as Plaintiff would sustain damages as a result of the above acts of negligence.

6. That these negligent acts show a conscious disregard for the health and welfare of the citizens of Memphis, Shelby County, Tennessee.

7. As a direct and proximate result of the above acts of negligence, Plaintiff sustained damages as set forth in her prayer for relief.

**BASED ON THE ABOVE STATED FACTS AND ALLEGATIONS**, Plaintiff brings this action against City of Memphis Fire Department pursuant to 42 U. S. C. § 2000e (Title VII discrimination in employment based on his gender); and against the City of Memphis Fire Department pursuant to 42 U.S.C. §§ 1981, 1982, 1983 and 1985 based on race. Defendants, including individual Defendants, acting under color of state law, deprived Plaintiff of rights guaranteed to her under the U.S. Constitution; and acted in conspiracy to do so; and against City of Memphis Fire Department pursuant to the Tennessee Public Protection Act and common law assault, as stated above.

## PRAYER FOR RELIEF

WHERFORE, the Plaintiff prays that this Court:

1. Grant the Plaintiff pain and suffering and all other compensatory damages for the humiliation, anxiety, and depression he was put through because of defendant's discriminatory conduct.

2. Grant the Plaintiff punitive damages against Defendants whose conduct was malicious or in reckless disregard for Plaintiff's federally protected rights in the amount of $5,000,000.00

3. Award Plaintiff all equitable relief in an amount that will provide for lost wages, attorney's fees and such amount as may be proved by evidence.

4. Award Plaintiff all other relief provided by statute, including treble damages under the Tennessee Public Protection Act.

5. Award Plaintiff all reasonable attorneys' fees, and litigation costs.

Respectfully Submitted,

s/ Brenda Oats-Williams
Brenda Oats-Williams TBN# 018830
Counsel for Plaintiff
217 Exchange Avenue
Memphis, Tennessee 38105
(901) 526-1889
Facsimile (901) 526-1894

## VERIFICATION

STATE OF TENNESSEE
COUNTY OF SHELBY

I, the undersigned, make oath that the facts stated in the foregoing Complaint are true to the best of my knowledge and belief; that the Complaint is not made out of levity or by collusion with the Defendants, but in sincerity and truth, for the causes mentioned in said bill.

Reginald A. Davis
Reginald Alan Davis, Plaintiff

SWORN TO AND SUBSCRIBED before me this the 10th day of Dec. 2011.

Mary L. Harmon
NOTARY PUBLIC

*[Notary Seal: MARY L. HARMON, STATE OF TENNESSEE NOTARY PUBLIC, COUNTY OF SHELBY, My Commission Expires April 06, 2014]*