**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **REGINALD ALAN DAVIS** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | No. 11-3076-STA-cgc |
| | ) | |
| **CITY OF MEMPHIS FIRE DEPARTMENT;** | ) | |
| **MAYOR A.C. WHARTON; ALVIN BENSON,** | ) | |
| **individually and in his official capacity as** | ) | |
| **Director of City of Memphis Fire Department;** | ) | |
| **SANDRA RICHARDS, individually and in her** | ) | |
| **official capacity; and DARYL PAYTON,** | ) | |
| **individually and in his official capacity,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION**
**TO DISMISS**

Before the Court is Defendant City of Memphis' ("Memphis") Motion for Summary

Judgment and Motion to Dismiss (D.E. # 132) filed March 22, 2013.[1]  Davis filed a Response

(D.E. # 135) on April 8, 2013, and filed an amendment to this Response (D.E. #140) on April 10,

2013.  For the reasons given below, the Court hereby **GRANTS** Memphis' Motion for Summary

Judgment and **GRANTS IN PART** and **DENIES IN PART** Memphis' Motion to Dismiss.

---

[1] The Court notes Memphis' Motion does not include a separate statement of undisputed facts as required by LR 56.1.  Instead, Memphis incorporates its statement of undisputed facts into the body of its memorandum of law.  In the interest of economy, and due to the time constraints of upcoming trial, the Court excuses this failure to abide by local rules.  The Court further notes the Motion to Dismiss filed after the close of pleadings is properly a Motion for Judgment on the Pleadings.  Taking substance over form, the Court construes and will analyze the Motion to Dismiss as a Motion for Judgment on the Pleadings.

# BACKGROUND

For purposes of Memphis' Motion for Summary Judgment, the Court accepts the following as established.[2]  Memphis employed Davis as a firefighter from April 28, 1989 until May 7, 2012.  (Def.'s Stat. Facts ¶ 1, D.E. # 132-1.)  During his employment with Memphis, Davis and other firefighters formed a chapter of the International Association of Black Professional Firefighters ("IABPFF").  (*Id.* ¶ 2.)  IABPFF is not a division, department, or branch of the City of Memphis.  (*Id.* ¶ 5)  The membership of the local IABPFF either elected or appointed Defendant Sandra Richards ("Richards").  (*Id.* ¶ 3.)  Richards later resigned her presidency, and Davis requested an audit of IABPFF's financial records.  (*Id.* ¶ 4.)  Richards then appeared on television and made accusations against Davis.  (*Id.* ¶ 6.)  Ulysses Jones, Jr. ("Jones") informed Lieutenant William Ratcliff ("Ratcliff") that if Davis did not back away from his investigation of Richards, Jones would have Davis arrested.  (Ratcliff Aff. ¶ 6, D.E. # 141-13.)  Davis filed a complaint with Memphis regarding this threat.  (*Id.* ¶ 8.)

On September 10, 2010, Division Chief Gina Sweat ("Sweat") requested a check of available lockers and beds at Fire Station 6 to accommodate new personnel.  (Sweat Decl. ¶ 5, D.E. # 132-2.)  Lieutenant Craig Eddins ("Eddins") conducted a search of unsecured and unmarked lockers in the locker room.[3]  (*Id.* ¶ 6.)  During this search, Eddins opened an unmarked and unlocked locker containing various items belonging to Davis, including a box of

---

[2] Memphis' Statement of Undisputed Facts contains several facts Memphis purports to support by reference to exhibits that do not appear in the record.  Where Davis indicates he does not dispute such facts, the Court will simply cite to Memphis' Statement of Undisputed Facts.  If there is readily-ascertainable record evidence supporting these facts, the Court will consider them properly supported and cite to the appropriate location in the record.

[3] The Court notes Davis disputes this fact, and cites an e-mail exchange between Davis and Battalion Chief Minquell Hubbard ("Hubbard") (Davis to Hubbard E-Mail, D.E. # 141-3). This e-mail does not raise any question as to whether Eddins searched unsecured and unmarked lockers.

ammunition.  (Def.'s Stat. Facts ¶¶ 11, 12 14; Sweat Decl. ¶¶ 14, 15.)[4]  Richards contacted

Division Chief Henry Posey ("Posey") regarding the box of ammunition.  (Def.'s Stat. Facts ¶

12.)  Posey and Richards inspected the locker, and Posey directed Eddins to contact Davis and

instruct Davis to remove the contents of the locker.  (*Id.* ¶ 12.)  Eddins did so, and Davis came to

the station and removed the box of ammunition.  (*Id.* ¶¶ 13-14.)  Posey informed Davis that

having a box of ammunition in his locker was not a violation of Memphis Fire Department

policy.  (Davis Aff. ¶ 31, D.E. # 135-1.)

On November 1, 2010, Davis filed a complaint with Hubbard and Posey, alleging

Richards conducted an illegal search of Davis' locker.  (Def.'s Stat. Facts ¶ 19.)  Posey and

Hubbard met with Davis on November 1, 2010 to discuss the situation.  (*Id.* ¶ 20.)  Division

Chief Daryl Payton then took over the investigation of Davis' complaints.  (*Id.* ¶ 22.)

On December 23, 2010, Eddins engaged in a discussion with Davis.[5]  (*Id.* ¶ 25.)  During

this discussion, Eddins used profane language.  (Davis Aff. ¶ 41.)  Following this discussion,

Davis contacted Richards to report an altercation and file a complaint.  (Def.'s Stat. Facts. ¶ 27-

28.)  On January 19, 2011, Davis complained about Eddins' behavior once again, this time to

Hubbard.  (Sweat Decl. ¶ 33.)  Hubbard met with Davis regarding his complaints on January 21,

2011.  (*Id.* ¶ 30.)

Ray Tate, the head of security at Owens Corning telephoned Sweat on February 7, 2011,

complaining about Davis' conduct when responding to alarm calls at Owens Corning's physical

---

[4] Davis disputes the locker was unmarked, asserting the presence of Davis' possessions
marked the locker as in use.  As commonly used, an unmarked container may or may not have
contents, and the nature of those contents does not transform an unmarked container into a
marked container.

[5] Memphis cites evidence that does not appear in the record that this discussion occurred.
However, it does not appear Davis does not dispute there was a discussion between Davis and
Eddins on this day, rather, Davis disputes the nature of the conversation.

plant.[6] (Sweat Decl. ¶ 33.) As a result of this complaint, Posey requested a mandatory employee referral for Davis.[7] (*Id.* ¶ 34.) During the investigation of this referral, Davis admitted he left his truck and men unattended while at the Owens Corning plant. (Def.'s Stat. Facts ¶ 41.) Davis received an oral reprimand for leaving his men on the fire truck. (Davis. Aff. ¶ 49.)

On February 17, 2011, because of Davis' ongoing problems at Fire Station 6, Memphis decided to temporarily assign Davis to Fire Station 42. (Sweat Decl. ¶ 40; Information Bulletin, D.E. # 141-4.) At the same time, the City reassigned Hagan Hardwick ("Hardwick"), a white male, to Fire Station 6. (Sweat Decl. ¶ 43; Information Bulletin.)

Fire Station 42 had an open Lieutenant position available for bid. (Def.'s Stat. Facts ¶ 51.) Davis did not submit a bid for this position. (Sweat Decl. ¶ 47.) Had Davis bid for this position, he would have received this permanent posting to Fire Station 42. (*Id.* ¶ 49). Because Davis did not bid on the open position at Fire Station 42, Memphis reassigned Davis to Fire Station 33. (*Id.* ¶ 48.) Memphis did not allow Davis to return to his prior post at Fire Station 6 after his temporary assignment at Fire Station 42 ended, although the Memorandum of Understanding between the firefighters' union and Memphis required they do so. (Davis Aff. ¶ 55; Mem. of Understanding, D.E. # 138-1 at 2.)

Davis' assignment to Fire Station 33 required he obtain certain certifications, which he did not obtain. (Sweat Decl. ¶ 51.) Davis complained to command staff regarding his concerns

---

[6] Davis marks this fact as disputed. However, Davis does not explain what he disputes, nor does he cite to record evidence disputing this fact. Therefore, as Memphis cites record evidence in support of this fact, the Court will take this fact as established for purposes of this Motion.

[7] Davis marks this fact as disputed and states Memphis does not properly cite to the record. The Court notes Memphis cites to paragraph 33 of Gina Sweat's Declaration, when the relevant information is contained at paragraph 34. As the Court sees the record supports this fact and Davis cites no record evidence to dispute it, it will consider this fact established for purposes of this Motion.

for public safety due to his and other firefighters at Fire Station 33 lack of necessary certification and training. (Davis Aff. ¶ 59; E-mail to Tucker, D.E. # 141-6.) In particular, Davis discovered he needed an AOA level badge to be on airport property and needed specialized training to fight fires at the airport under FAA regulations, and that neither he nor his crew had such a badge or training. (Davis Aff. ¶¶ 56-57.) Davis attempted to train himself by reading manuals and speaking with Lieutenant Eddie Ewing. (*Id.* ¶ 63; Ewing Aff. ¶¶ 4-5, D.E. # 141-25)

On May 31, 2011, Memphis moved Davis to a temporary assignment at Fire Station 45.[8] (Third Am. Compl. ¶ 49; D.E. # 47.) That same day, Davis requested a meeting with Air Rescue Chief Jimmie Tucker ("Tucker"), Chief Lewis ("Lewis"), and Payton. (Def.'s Stat. Fact ¶ 61.)

On June 3, 2011, Division Chief of Special Operations Carlos Newsom ("Newsom") met with Davis at Fire Station 45 and discussed Davis' temporary assignments and Davis' concerns regarding safety at Fire Station 33. (Davis Aff. ¶ 69.) At Davis' request, Private Mike Echols ("Echols") was also present at this meeting. (Def.'s Stat. Fact ¶ 63.) On June 3, 2011, Sweat e-mailed Davis to inform him Payton would meet with Davis on either June 3 or June 5, 2011. (*Id.* ¶ 64.) Payton went to Fire Station 45 on June 5, 2011 to meet with Davis.[9] (Def.'s Stat. Fact ¶ 65.) Davis asked that Echols sit in on this meeting as well. (*Id.* ¶ 66.) During this meeting, Payton used profanity towards Davis, which upset Davis to the point where Davis decided he

---

[8] The Court notes Davis, in his affidavit and Statement of Disputed Facts, refers to several events in this and the following paragraphs as occurring at Fire Station 42. In light of Davis' previous assertions and Memorandum in Response, the Court assumes this is a typographical error and that Davis meant Fire Station 45. The Court does not see that the difference is material.

[9] Memphis cites to nonexistent record evidence to support this fact, and Davis marks this fact as disputed, stating there was no reason for Payton to go to Fire Station E-45-B because Davis had already met with Newsom and had requested a meeting with a Director. Nonetheless, it does not appear Davis disputes that Payton went to Fire Station E-45-B and met with Davis, as other undisputed facts indicate Payton was present and spoke with Davis. *See, e.g.,* Def.'s Stat. Facts ¶ 66.

needed to remove himself from duty status. (Third Am. Compl. ¶¶ 63-65.) Davis attempted to use the fire station telephone to remove himself from duty, only to have Payton hang the phone up three times. (Davis to Cooper E-mail at 2, D.E. # 141-7.) When Davis attempted to leave, Payton blocked his exit and grabbed Davis around the legs. (*Id.*) Davis lost his balance, and fell into the wall, suffering a broken finger and sprained wrist. (*Id.*) On leaving Fire Station 45, Davis went to the Memphis Police Department station on Union Avenue and accused Payton of assault. (Third Am. Compl. ¶ 69.)

The Memphis Police Department assigned Sergeant Weams ("Weams") to investigate Davis' assault allegations on June 6, 2011. (Def.'s Stat. Fact ¶ 69.) Weams took written statements from Echols and two other firefighters present at Fire Station 45 at the time of the alleged assault, Aaron Bright ("Bright") and Terrence Jones ("Jones"). (Third Am. Compl. ¶ 74.) While these written statements did not corroborate Davis' assault allegations, Bright and Jones wrote that Payton followed Davis into the small room where Davis alleges Payton assaulted him. (Sweat Decl. ¶ 64; Davis Aff. ¶ 83.) On June 6, 2011, Payton barred Davis from Memphis Fire Department property. (Reeves E-mail, D.E. # 141-15.) On July 7, 2011, the Shelby County Attorney General's office declined to prosecute Davis' assault charge against Payton. (Def.'s Stat. Fact ¶ 84.)

Davis submitted a claim for an on-the-job injury for injuries sustained in the alleged assault. (Third Am. Compl. ¶ 70.) Memphis reported this claim to Sedgwick Claims Management Services ("Sedgwick"), Memphis' on-the-job injury insurance carrier. (Def.'s Stat. Fact ¶ 74.) Sedgwick denied Davis' claim on October 20, 2011. (*Id.* ¶ 83.)

Davis filed an internal complaint against Payton for assault with Memphis. (Third Am. Compl. ¶ 73.) Memphis conducted an investigation and took written reports from Echols,

Bright, and Jones. (*Id.* ¶ 74.) On June 8, 2011, Benson, Deputy Director Michael Putt ("Putt"), and Division Chief Michael Jubirt ("Jubirt") interviewed Echols, Bright, and Jones regarding the events of June 5, 2011. (Sweat Decl. ¶ 70.) Echols, Bright, and Jones' accounts of events did not support Davis' version of events, nor did they fully support Payton's version of events.[10] (*Id.* ¶ 72.) During the June 8, 2001 hearing, Davis discussed his relationship with Richards. (*Id.* ¶ 71.) Following the hearing, Memphis relieved Davis of duty with pay. (*Id.* ¶ 73.) On July 12, 2011, Putt sent Davis a letter informing Davis Memphis was closing the investigation due to a lack of substantial evidence. (Putt Letter, D.E. # 141-23.) Davis requested Memphis reopen his complaint against Payton on March 29, 2012. (Def.'s Stat. Fact ¶ 94.)

On July 5, 2011, Hubbard engaged in a conversation with Private Emmitt Brinson ("Brinson"), Lieutenant William Westbrook ("Westbrook"), Private Cortino Williams ("Williams"), Lieutenant Derrick Williamson, and Dr. Tony Reynolds ("Reynolds") in which Hubbard referred to Davis as a "problem employee"[11] and "crazy."[12] (Davis to Jubirt E-mail and Hubbard to Sweat/Payton E-mail, D.E. # 141-10; Westbrook Aff. ¶ 7, D.E. # 141-9.)

On July 9, 2011, Davis accused Richards of harassing him by coming to his driveway and driving away when approached. (Third Am. Compl. ¶¶ 78-79.) Sweat assigned Division Chief

---

[10] The Court notes Davis disputes whether Echols, Bright, and Jones' testimony did not support Davis' version of events at the June 8 hearing, stating their testimony did not support Payton's version either and that their statements *to the police* supported Davis' version. Neither contention contradicts the factual assertion that Echols, Bright, and Jones' testimony did not support Davis' version of events, so the Court takes this fact as established for purposes of the instant Motion.

[11] Davis states Hubbard admitted to calling Davis a "problem child" but this phrase does not appear in the cited material.

[12] Davis states Chief Larry Harris also made disparaging remarks about Davis, but cites to Exhibit 29 for this proposition. No Exhibit 29 appears in the record.

Kenneth Reeves ("Reeves") to investigate Davis' allegations, and Reeves determined Davis'

allegations were baseless.[13]  (Sweat Decl. ¶ 76.)

On July 13, 2011, Jubirt referred Davis for a fitness for duty test.  (Def.'s Stat. Fact ¶ 88.)

Dr. Neil Aronov performed this examination and determined Davis was fit for duty.  (*Id.* ¶¶ 90-

91.)  Pursuant to Davis' fit-for-duty status, Memphis assigned Davis to Fire Station 32.  (*Id.* ¶

91.)

On July 30, 2011, Davis filed a charge of discrimination with the Equal Employment

Opportunity Commission, alleging race and sex discrimination, retaliation, and hostile work

environment.  (Def.'s Stat. Facts ¶ 82.)  The EEOC issued Davis a "right to sue" letter on

September 13, 2011.  (*Id.* ¶ 91.)  Davis commenced the instant suit by filing a Complaint on

December 10, 2011.  (Compl., D.E. # 1.)

On April 2, 2012, Davis' attorney, Brenda Oats-Williams ("Oats-Williams") appeared on

a television news broadcast and gave information regarding Davis' assault allegations against

Payton.  (Pl.'s Resp. Stat. Facts ¶ 100, D.E. # 140-1; Third Am. Compl. ¶ 97.)  Although Davis

did not personally give a statement and did not know he was on camera, he appeared on the

broadcast with Oats-Williams.  (Pl.'s Resp. Stat. Facts ¶ 100, Davis Aff. ¶ 101.)  The Memphis

Fire Department Manual provides "Employees are prohibited from making statements or

conducting interviews concerning any subject matter other than on-scene emergency responses

unless approved beforehand by a member of the command staff."  ("Media Policy")  Memphis

---

[13] The Court notes Davis objects to this statement of fact as not properly cited to the record.  Memphis provides a citation to evidence that does not appear in the record to support this fact.  However, this information also appears in the declaration of Gina Sweat.  Davis further disputes that Davis' allegations against Richards were baseless, because Richards currently faces fraud and forgery charges.  The Court does not see how Richards' potential criminal liability for fraud and forgery calls into question that Reeves found Davis' harassment charges baseless.

Fire Department Command Staff did not give approval for Davis to conduct an interview.[14]
(Sweat Decl. ¶ 90.)  On April 16, 2011, Oats-Williams appeared on a television news broadcast a second time, and gave an interview regarding an incident at Memphis International Airport involving a fire truck from Fire Station 33.  (Pl.'s  Resp. Stat. Fact. ¶ 102, Third Am. Compl. ¶¶ 100-01.)  Davis was unaware of the second interview at the time it occurred.  (Davis Aff. ¶ 103.)

Following a hearing, Memphis terminated Davis.  (Sweat Decl. ¶ 92.)  Memphis did not allow Davis to have counsel other than union counsel present during this hearing, and union counsel declined to represent Davis.  (Davis Aff. ¶ 106; Third Am. Compl. ¶¶ 106-07.)  Prior to Davis' investigation of Richards, Hubbard had recommended Davis for Firefighter of the Year.[15]
(Hubbard to Posey E-mail, D.E. # 141-1.)  Two white firefighters, Sue Manus and Robert Kramer, received suspensions after violating the Media Policy.  (Davis Aff. ¶ 111.)

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that a party is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[16]  In reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party.[17]  As a result, the

---

[14] Davis disputes this fact, stating Oats-Williams did not need approval to give a media interview.  Whether Oats-Williams' needed to obtain approval from the Memphis Fire Department Command Staff is irrelevant to the fact Command Staff did not give Davis approval for a media interview.  The Court takes this fact as undisputed.

[15] Davis also asserts he had an unblemished disciplinary record prior to his investigation of Richards, but cites no evidence to support this assertion other than Hubbard's e-mail, which contains no reference to Davis' disciplinary record.

[16] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Canderm Pharmacal, Ltd. v. Elder Pharms., Inc.*, 862 F.2d 597, 601 (6th Cir. 1988).

[17] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"judge may not make credibility determinations or weigh the evidence."[18]  When the moving party supports the motion with documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings, but must present some "specific facts showing that there is a genuine issue for trial."[19]  It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts."[20]  These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict.[21]  When determining if summary judgment is appropriate, a court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."[22]  A court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[23]  In the Sixth Circuit, "this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [her] asserted causes of action."[24]

## ANALYSIS

---

[18] *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994).

[19] *Celotex*, 477 U.S. at 324.

[20] *Matsushita*, 475 U.S. at 586.

[21] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

[22] *Id*. at 251-52.

[23] *Celotex*, 477 U.S. at 322.

[24] *Lord v. Saratoga Capital, Inc.*, 920 F. Supp. 840, 857 (W.D. Tenn. 1995) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989)).

Memphis asks the Court for summary judgment on Davis' claims under Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. § 1981, and for judgment on the pleadings on Davis' claims under 42 U.S.C. § 1983 for purported violations of the First, Fifth, and Fourteenth Amendments.

## Title VII Retaliation

Davis alleges Memphis illegally retaliated against him for engaging in protected activity under 42 U.S.C. § 2000e-3(a). Title 42, U.S.C. § 2000e-3 provides

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees…because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.[25]

Davis contends Memphis retaliated against him by repeatedly transferring him from one fire station to another and, ultimately, by terminating his employment. Both parties appear to concede there is no direct evidence of racial motivation behind either Davis' transfers or his termination, as both parties direct their briefing towards whether Davis makes out a prima facie case for retaliation under standards applicable to cases where only circumstantial evidence exists.

To determine whether Davis makes out a prima facie case for retaliation under Title VII or without presenting direct evidence of racial motivation, the Court turns to the familiar *McDonnell Douglas/Burdine*[26] framework.[27] Under this framework, a plaintiff alleging retaliation makes out his prima facie case by establishing:

---

[25] 42 U.S.C. § 2000e-3(a).

[26] Referring to *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981) and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

[27] *Charles v. Postmaster Gen.*, 97 Fed. App'x 536, 538 (6th Cir. 2004) (citing *Jacklyn v. Shering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 928-30 (6th Cir. 1999)).

(1) [the complainant] engaged in activity protected by Title VII; (2) this exercise of protected rights was known to the defendant; (3) the defendant thereafter took an adverse employment actions against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action.[28]

A defendant may rebut this prima facie case by articulating a "legitimate, nondiscriminatory reason" for the adverse employment action.[29] If a defendant articulates such a reason, the plaintiff must produce credible evidence the asserted reason is pretextual.[30] Such evidence must show either "(1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate his discharge, or (3) that they were *insufficient* to motivate discharge."[31] The Sixth Circuit instructs district courts the plaintiff's burden under the *McDonnell Douglas/Burdine* framework is "not onerous" and "easily met".[32] However, at all times the plaintiff bears the burden of persuasion in the *McDonell Douglas/Burdine* framework, regardless of which party bears the burden of production.[33]

Discussing what constitutes protected activity, the Supreme Court noted

[t]he Title VII anti-retaliation provision has two clauses, making it "an unlawful employment practice for an employer to discriminate against any of his employees ... [1] because he has opposed any practice made an unlawful employment practice by this subchapter, or [2] because he has made a charge,

---

[28] *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 860 (6th Cir. 1997).

[29] *Burdine*, 450 U.S. at 253; *McDonnell Douglas*, 411 U.S. at 802.

[30] *Burdine*, 450 U.S. at 253; *McDonnell Douglas*, 411 U.S. at 804.

[31] *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (emphasis in original) *rev'd on other grounds, Geiger v. Tower Auto.*, 579 F.3d 614 (6th Cir. 2009).

[32] *See, e.g., Avery Dennison*, 104 F.3d at 861.

[33] *Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784, 793 (6th Cir. 2000).

testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."[34]

These two clauses are typically denominated the "opposition clause" and the "participation clause."  Courts generally analyze actions before the filing of formal proceedings under Title VII under the opposition clause.[35]  "Although courts should liberally construe the opposition clause, 42 U.S.C. § 2000e-3(a) does not protect all opposition activity."[36]  Title VII does not protect opposition where "'the employee's conduct in protest of an unlawful employment practice so interferes with the performance of his job that it renders him ineffective in the position for which he was employed.'"[37]  "When an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always 'constitutes the employee's *opposition* to that activity'"[38]

The Court finds Davis does not make out a prima facie case for retaliation with respect to his transfers.  Davis took no protected actions prior to his transfers.  Title 42, U.S.C. 2000e-3(a) provides protection for those who take actions in opposition to practices made illegal under Title VII, not action in opposition to any unlawful practice.  Reading the evidence in the light most favorable to Davis and making all reasonable inferences in Davis' favor, the Court finds that Davis requested an audit of IABPFF's finances, that Davis complained of an illegal search of his

---

[34] *Crawford v. Metro. Gov't Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 274 (2009).

[35] *See Booker v. Brown & Williamson Tobacco Co., Inc.,* 879 F.2d 1304, 1312 (6th Cir. 1989).

[36] *Holden v. Owens-Ill., Inc.*, 793 F.2d 745, 751 (6th Cir. 1986) (internal quotations omitted.)

[37] *Id.* (quoting *Rosser v. Laborers' Int'l Union*, 616 F.2d 221, 223 (5th Cir. 1980).

[38] *Crawford*, 555 U.S. at 851.

locker, that Davis complained about a confrontation with Eddins, that Davis complained about a dangerous lack of training and certification among firefighters at Fire Station 33, and that Davis filed criminal charges and an internal complaint regarding an assault by Payton. While Davis may have been justified in his complaints, they were not in opposition to employment practices made illegal *by Title VII*. Davis makes no allegation Richards' purported mishandling of IABPFF finances was motivated by racial (or other consideration made improper by Title VII) bias, that the search of his locker was motivated by racial bias, that Eddins' confrontation with Davis was motivated by racial bias, that the lack of training and certification at Fire Station 33 was motivated by racial bias, or that Payton's assault was motivated by racial bias. While his travails indicate he may have received ill treatment at the hands of his employer, they are not actionable under Title VII.

With respect to Davis' termination, the Court likewise finds Davis does not make out his prima facie case under the *McDonnell Douglas/Burdine* framework. Davis engaged in protected activity by filing a charge of discrimination with the Equal Employment Opportunity Commission on July 30, 2011. Davis engaged in further protected activity by filing the instant suit on December 10, 2011. Memphis knew of Davis' protected activity no later than January 24, 2013, when Memphis filed an Answer to Davis' Complaint. Memphis took adverse action subsequent to knowing of the protected action when it terminated Davis on May 7, 2012.

However, Davis fails to show a causal connection between his termination and his protected activity. Davis simply states that "but for . . . exercising his due process rights under the City policies and the Union Memorandum of Understanding, he would not have been subjected to an endless roller coaster of temporary reassignments, assaulted, harassed and humiliated, loss [sic] overtime pay, and terminated." Nowhere in this litany of grievances does

Davis argue Memphis retaliated against him for engaging in protected activity *under Title VII*. Title VII does not mandate a general code of civility or good conduct in the workplace, nor does it protect an employee's exercise of due process rights.[39]  Title VII's anti-retaliation provisions protect the exercise of rights under Title VII; no more, and no less.

Assuming *arguendo* Davis makes out a causal connection between his termination and his protected actions, Memphis rebuts Davis' putative prima facie case by articulating a legitimate, non-discriminatory reason for his termination.  Memphis contends Davis' multiple violations of the Media Policy and repeated complaints regarding his coworkers were the cause of his termination.

Davis correctly notes that once Memphis articulates a legitimate, non-discriminatory reason for Davis' termination, the burden of production under the *McDonnell Douglas* framework shifts back to Davis to show Memphis' articulated reason is pretextual.[40]  However, Davis makes no effort to do so in his Memorandum in Response.  In an effort to give Davis every benefit of the doubt on this Motion for Summary Judgment, the Court notes Davis maintains Memphis improperly imputed Oats-Williams statements to him in other filings, which arguably goes to the factual basis for Memphis' actions.  However, although imputation of Oats-Williams' statements to Davis for purposes of the Media Policy may have been imprudent, it is not this Court's role to question Memphis' business judgment in doing so; Memphis' "asserted business judgment was [not] so ridden with error that [Memphis] could not honestly have relied on it."[41]  While such a presumption may be factually incorrect, the Court does not find Memphis'

---

[39] *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80-81 (1998).

[40] Resp. in Opp. at 10, D.E. # 140.

[41] *Lewis v. Sears, Roebuck & Co.*, 845 F.2d 624, 633 (6th Cir. 1988).

presumption Oats-Williams' statements regarding subjects related to pending litigation were on her client's behalf manifestly unreasonable.

Further, liberally construing Davis' filings, Davis makes a contention regarding disparate treatment under 42 U.S.C. § 2000e-2 that arguably goes to whether Davis' violations of the Media Policy and continued problems with coworkers were the actual reason for his termination. Davis asserts in his Statement of Disputed Facts that Memphis suspended two white firefighters for violating the Media Policy instead of firing them. However, Davis cites to a nominal affidavit bearing no notarial seal, not given under oath, and out of compliance with the requirements of an unsworn statement under 28 U.S.C. § 1746.[42] The Court cannot consider this document record evidence.[43] The Court notes Davis does introduce (though does not cite) his own affidavit stating white firefighters Sue Manus and Robert Kramer were suspended for violations of the Media Policy. However, this alone does not show pretext on the part of Memphis. Facts presented by the non-moving party must be more than a "scintilla" and must meet the standard they could convince a reasonable juror by a preponderance of the evidence the non-moving party is entitled to a verdict.[44] That two other firefighters received suspensions for violations of the Media Policy, without more, does not establish pretext, when Davis provides no cognizable evidence regarding the other firefighters' situation or the nature of their violations.

---

[42] Pl.'s Stat. Disp. Facts. ¶ 35, D.E. # 140-2; Kramer Aff. ¶¶ 1, 4-8.

[43] *See Zaialian v. Memphis Bd. of Educ.*, 3 F. App'x 439, 431 (6th Cir. 2001). *Zaialian* presented facts startlingly similar to these: a plaintiff asserting a Title VII retaliation claim introduced an unsworn, un-notarized document that did not contain the language prescribed in 28 U.S.C. § 1746 in order to survive summary judgment. The Sixth Circuit held it proper to consider the affidavit simply an additional pleading, and not record evidence.

[44] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Since Davis does not make out a prima facie case for retaliation for either his transfers or his termination, the Court **GRANTS** Memphis' Motion for Summary Judgment with respect to Davis' retaliation claims. As an alternative holding, the Court finds Memphis articulates a legitimate, nondiscriminatory reason for Davis' termination which Davis fails to rebut.

### Discrimination under Title VII and 42 U.S.C. § 1981

Once again, the parties agree Davis does not present direct evidence of race discrimination, so the Court must turn to the *McDonnell Douglas/Burdine* framework to determine whether Davis makes out a prima facie case of race discrimination under either Title VII or 42 U.S.C. § 1981. "The *McDonnell Douglas/Burdine* formula is the evidentiary framework applicable not only to claims brought under Title VII, but also . . . to claims under 42 U.S.C. § 1981."[45] A district court may "lump[] together" Title VII and Section 1981 claims for analysis under this framework.[46] Title VII's anti-discrimination provision provides "[i]t shall be an unlawful employment practice from an employer to . . . discharge any individual . . . because of such individual's race[.]"[47] Section 1981 provides "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens[.]"

To make out a prima facie case for racial discrimination under 42 U.S.C. §§ 1981 or 2000e-2 using the *McDonnell Douglas/Burdine* framework, a plaintiff must show he is a member of a protected class, that he suffered an adverse action, that he was qualified for the position, and that the employer replaced him with someone outside the protected class or treated him

---

[45] *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (citing *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989)).

[46] *Id.*

[47] 42 U.S.C. § 2000e-2(a)(1).

differently than similarly situated members outside the plaintiff's protected class.[48]  Once the plaintiff establishes this prima facie case, a defendant may rebut it by articulating a legitimate, nondiscriminatory reason for the adverse action.[49]  When a defendant articulates such a legitimate, nondiscriminatory reason for the adverse action, the burden shifts to the plaintiff to show the articulated reason is pretextual.[50]  As always, even though the burden of production shifts through this analysis, the burden of persuasion remains with the Plaintiff at all times. [51]

Davis makes out a prima facie case for racial discrimination under the *McDonnell Douglas/Burdine* framework with respect to his transfers.  It is undisputed Davis is African American, and thus a member of a protected class.  It is likewise undisputed Davis suffered an adverse employment action: Memphis transferred him from Fire Station 6 to Fire Station 42, which involved loss of overtime opportunities.  Although Davis simply states in conclusory fashion that he was qualified for his position, the Court determines from the evidence on the record that Davis held a position as Lieutenant for a number of years and that a reasonable juror could conclude Davis was qualified for his position.  Finally, Memphis replaced Davis at Fire Station 6 with a white firefighter, a person outside Davis' protected class.

However, Memphis rebuts Davis' prima facie case by asserting legitimate, non-discriminatory reasons for Davis' transfer from Fire Station 6.  Memphis states it transferred Davis because he was disruptive in the workplace, because Davis filed numerous complaints about his co-workers at Fire Station 6, because of the alleged altercation between Davis and the

---

[48] *Warfield v. Lebanon Corr. Inst.*, 181 F.3d 723, 728-29 (6th Cir. 1999).

[49] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

[50] *Id.* at 804.

[51] *Morris v. Oldham Cnty. Fiscal. Ct.*, 201 F.3d 784, 793 (6th Cir. 2000).

security manager at Owens Corning, and Davis' complaints about Richards. The Court finds these to be legitimate, non-discriminatory reasons to transfer an employee from one position to another. Davis makes no attempt to show Memphis' reasons for transferring him were pretextual, so the Court has no choice but to grant Memphis summary judgment as to Davis' claims for racial discrimination with respect to his transfers.

Davis does not make out his prima facie case with respect to his termination. Although Davis is a member of a protected class, termination is an adverse employment action, and Davis was likely qualified for his position as a Lieutenant, Davis fails to introduce evidence he was replaced with a person outside his protected class or that he was subjected to disparate treatment on account of his race. Davis argues that different disciplinary outcomes for two white firefighters, Sue Manus ("Manus") and Robert Kramer ("Kramer"), for violations of the Media Policy show disparate treatment. However, Davis introduces no cognizable evidence Manus and Kramer were similarly-situated. Even taking Kramer's purported affidavit into account,[52] Davis violated the Media Policy twice, while Kramer violated the Media Policy once. There is no evidence showing what events led to Manus' suspension, whether Manus violated the Media Policy more than once, or whether Manus was involved in disputes with her coworkers like Davis. Therefore, because Davis fails to show Manus and Kramer were similarly situated, he fails to make out his prima facie case for racial discrimination under 42 U.S.C. § 2000e-2 or 42 U.S.C. § 1981 with respect to his termination.

Because Memphis asserts legitimate, non-discriminatory reasons for both Davis' transfer, and because Davis fails to make out his prima facie case with respect to his termination, the

---

[52] *See supra* n. 43 as to why the Court cannot accept Kramer's affidavit as record evidence.

Court **GRANTS** Memphis' Motion for Summary Judgment with respect to Davis' claims of racial discrimination under Title VII and 42 U.S.C. § 1981.

## 42 U.S.C. § 1983

Memphis also moves the Court for judgment on the pleadings with respect to Davis' claims for violations of the First, Fifth, and Fourteenth Amendment through 42 U.S.C. § 1983. "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nonetheless entitled to judgment."[53] A court "need not accept as true legal conclusions or unwarranted factual inferences."[54] A court will grant a motion under Rule 12(c) "when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law."[55] When reviewing a motion under Rule 12(c), "the court considers all available pleadings, including the complaint and the answer."[56]

> The court can also consider: (1) any documents attached to, incorporated by, or referred to in the pleadings; (2) documents attached to the motion for judgment on the pleadings that are referred to in the complaint and are central to the plaintiff's allegations, even if not explicitly incorporated by reference; (3) public records; and (4) matters of which the court may take judicial notice.[57]

---

[53] *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007) (internal quotations omitted.)

[54] *S. Ohio Bank v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 193 F.3d 398, 400 (6th Cir. 1999).

[55] *Paskvan v. City of Cleveland Civil Serv. Comm'n*, 946 F.2d 1233, 1235 (6th Cir. 1991).

[56] *Dudek v. Thomas & Thomas Attorneys & Counselors at Law, LLC*, 702 F. Supp. 2d 826, 832 (N.D. Ohio 2010); *see Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

[57] *Dudek*, 702 F. Supp 2d at 832.

Memphis purports to rely on this Court's Order Granting in Part and Denying in Part Defendants' Motion to Dismiss for Failure to State a Claim Against Daryl Payton and Alvin Benson in Their Individual Capacities (D.E. # 127) and argues the reasoning of that order applies to Memphis as well as Payton and Benson. The Court disagrees. The Court's reasoning in that order rested on Davis' failure to plead what Payton and Benson did *individually* to violate Davis' rights.[58] Davis pleaded several additional facts attributable to Memphis that he did not plead with respect to Payton and Benson, and did not, as Memphis asserts, rest his constitutional claims solely on Payton and Benson's actions. Therefore, the Court **DENIES IN PART** Memphis' Motion for Judgment on the Pleadings with respect to Davis' claims through 42 U.S.C. § 1983 under the First and Fourteenth Amendments to the United States Constitution.[59] However, because the Due Process Clause of the Fifth Amendment applies only to instrumentalities of the federal government, the Court **GRANTS IN PART** Defendant's Motion for Judgment on the Pleadings with respect to any purported claim against all Defendants under the Fifth Amendment.[60]

## CONCLUSION

Because Davis fails to make out a prima facie case for retaliation under Title VII, the Court **GRANTS** Memphis' Motion for Summary Judgment with respect to Davis' retaliation

---

[58] Order Granting in Part and Denying in Part at 11, D.E. # 127.

[59] The Court notes Memphis asks it to dismiss Davis' claims under 42 U.S.C. § 1988. The Court dismissed these claims with respect to all defendants in its order of March 1, 2013. Therefore, Memphis' Motion to Dismiss with respect to Davis' claims under 42 U.S.C. § 1988 is moot.

[60] *See Bolling v. Sharpe*, 347 U.S. 496 (1954); *Publ. Utils. Comm'n of D.C. v. Pollak*, 343 U.S. 451, 461 (1952); *Hockenberry v. Village of Carrolton*, 110 F. Supp. 2d 597, 603 (N.D. Ohio 2000); *Haverstick Enter., Inc. v. Fin. Fed. Credit Union.*, 803 F. Supp. 1251, 1259 (E.D. Mich. 1992).

claims. Because Davis fails to show Memphis' legitimate, non-discriminatory reasons for transferring and terminating him were pretextual, the Court **GRANTS** Memphis' Motion for Summary Judgment with respect to Davis' discrimination claims under Title VII. Because the Fifth Amendment's Due Process Clause does not apply to state or local governments, the Court **GRANTS IN PART** Memphis' Motion for Judgment on the Pleadings with respect to Davis' 42 U.S.C. § 1983 claims under the Fifth Amendment. Because the Court's prior reasoning with respect to Davis' 42 U.S.C. § 1983 claims under the First and Fourteenth Amendment claims as applied to the Payton and Benson is not extensible to Memphis, the Court **DENIES IN PART** Memphis' Motion for Judgment on the Pleadings with respect to Davis' 42 U.S.C. § 1983 claims under the First and Fourteenth Amendments.

   **IT IS SO ORDERED.**

        **s/ S. Thomas Anderson**
        S. THOMAS ANDERSON
        UNITED STATES DISTRICT JUDGE

        Date: April 16, 2013.